**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq.
Jeffrey D. Prol, Esq.
Nicole Fulfree, Esq.
Michael Papandrea, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and
Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| Mountain Creek Resort, Inc., *et al.*,[1] | Case No. 17-19899 (SLM) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF JEFFREY KOFFMAN IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Jeffrey Koffman, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a Director and the Chief Executive Officer of Mountain Creek Resort, Inc.

("MCRI") and am an officer or manager of the remaining debtors and debtors-in-possession

(together, the "Debtors," or the "Company").

2.      I have been an officer of MCRI since June, 2015.  I am familiar with the

Company's business and financial affairs.  I am responsible, together with the other members of

the Company's senior management team, for, among other things, devising and implementing

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Mountain Creek Resort, Inc. (4557), Mountain Creek Services Inc. (3228), Mountain Creek Management, LLC (1394), Mountain Creek Mountainslide, LLC (1545), Mountain Leasing LLC (6057), and Appalachian Liquors Corporation (9542).

strategies for the Company, including, *inter alia*, (i) understanding and shaping the business and financial affairs of the Company; (ii) developing a cash flow analysis and assessing the current liquidity position of the Company; (iii) exploring and implementing various restructuring strategies for the Company; and (iv) serving as a contact with the Company's creditors and vendors. I am familiar with the Company's books and records, and I have acquired extensive knowledge of the Company and its day-to-day operations and business affairs, including its assets, liabilities, historical operations, and future plans.

3.      I submit this declaration (the "Declaration") pursuant to section B(3) of the *Guidelines Governing First Day Matters*, set forth in Appendix A to rule 6003-1 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Bankruptcy Rules") in support of the voluntary petitions for relief for the Debtors' cases (together, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions and applications for related relief filed as of the date hereof (the "Petition Date") or concurrently herewith (collectively, the "First Day Pleadings").

4.      I have reviewed the First Day Pleadings or have otherwise had their contents explained to me and, to the best of my knowledge and insofar as I have been able to ascertain after reasonable inquiry, I believe that approval of the relief requested therein is necessary to minimize disruption to the Debtors' business operations, permit an effective transition into chapter 11, and preserve and maximize the value of the Debtors' estates.

5.      I also believe that absent immediate access to financing and authority to make certain essential payments and otherwise continue conducting ordinary course business operations as described in greater detail in the First Day Pleadings, the Debtors would suffer

immediate and irreparable harm to the detriment of their estates, creditors, and other stakeholders.

6.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me or verified by other managers, employees or the Debtors' professional advisors, including Lowenstein Sandler LLP ("Lowenstein Sandler"), Getzler Henrich & Associates, LLC ("Getzler") and Houlihan Lokey ("Houlihan"), and/or my opinion based upon my experience, and/or knowledge and information concerning the Debtors' financial records and the resort management industry generally.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

7.      I am authorized to submit this Declaration on behalf of the Debtors and, if called upon, I would testify competently to the facts set forth herein.

## PRELIMINARY STATEMENT

8.      The Debtors own and operate a four-season  resort located in Vernon, New Jersey ("Mountain Creek" or the "Resort").  The Resort is the New York/New Jersey Metro area's closest ski resort with 167 skiable acres on four mountain peaks, 1,040 vertical feet, 46 trails, and 11 lifts.  The Resort offers a 34 lane snow tubing park, night skiing with more than 1,000 lights on all trails, North America's only eight passenger open-air gondola, and the region's most extensive, state of the art snowmaking system (the "Winter Operations").

9.       In addition, the Resort offers substantial summer operations including a 25 acre waterpark, an alpine roller coaster (the "Mountain Coaster"), a bike park, and a zip line park (the "Summer Operations").

10.     The Resort also operates and manages the Appalachian Hotel and the Black Creek Sanctuary townhomes (the "Hotel Operations"), which are structured as residential

condominiums sold to individuals. Individual unit owners have the option of placing their units within a hotel rental pool operated by the Resort, in which units are offered as part of the full-service hotel. The Black Creek Sanctuary townhome development is a residential style development with an outdoor pool, year round hot tubs, and outdoor barbeque sites, but has interior finishes more typical of those found in service hotels. The Appalachian Hotel is operated as a more traditional hotel and amenities include but are not limited to an exercise room, outdoor pool, hot tub, game room, and subterranean parking.

11.    In the Appalachian Hotel and the Resort's two main lodges—the South Lodge and the Red Tail Lodge—Mountain Creek operates multiple restaurants including but not limited to Jack and Ottos, The Hawks Nest gourmet restaurant, Kink bar and grill, South Square, the Schuss Bar and Restaurant, the Market, the Boardwalk, and the Biergarten. The Red Tail Lodge, which opened in the 2011/2012 ski season, also operates exclusive wedding and catering hall services (the "Food and Beverage Operations").

12.    In 2007, the Resort obtained general development approval for, among other things, additional lodging units, commercial/retail space, and a conference center, with vesting zoning rights over a twenty (20) year period. The Resort's master plan offers the potential for significant additional development at Mountain Creek.

13.    Mountain Creek started as Great Gorge Resort in 1965 on what is now known as Bear and South Peaks. In 1971, Great Gorge expanded to Great Gorge North which is now known as Granite Peak, and Vernon Valley Ski Resort opened on what is now known as Vernon Peak. Great Gorge and Vernon Valley eventually merged and became one 4-peak ski resort known as Vernon Valley/Great Gorge. In 1978, Action Park, the area's premier amusement and

waterpark, opened its doors and began Vernon Valley/Great Gorge's expansion into a multi-season resort.

14.    In 1998, a new era began at Vernon Valley/Great Gorge when Intrawest, which owns and operates destination ski resorts such as Tremblant, Stratton, Winter Park and Steamboat, purchased the Resort.  Vernon Valley/Great Gorge was renamed Mountain Creek, with visions of becoming a premier four-season resort destination.  Intrawest invested in renovation, development and infrastructure throughout the early 2000s, and  Mountain Creek became one of the east coast's top snowboarding and terrain park resorts, hosting many events, most notably the US Snowboarding Grand Prix in 2004 and 2005.  Intrawest also implemented an aggressive real estate development plan for construction of hotels, condominiums and single family homes, including entering into various agreements with the Township of Vernon to increase sewer capacity to service the Resort and its real estate development projects.

15.    In 2010, a local ownership group, including families originally involved in Great Gorge and Vernon Valley, purchased the Resort and sought to upgrade the amenities which included construction of the Red Tail Lodge, with new restaurants, bars and an improved equipment rental area.  In June 2015, the Koffman family, one of four partners that purchased Mountain Creek in 2010, became the sole owner of the Resort.  The Koffman family is committed to the continued development of the Resort into a four season destination resort.

16.    In recent years, however, the Company's liquidity has been strained in large part due to a combination of warmer than average winter temperatures which has resulted in lower revenues from operation of the ski resort, litigation with Palace Entertainment arising from  prior ownership's termination of its lease to operate the waterpark, a downturn in the residential real estate market in Vernon that has  slowed the Company's efforts to develop its real estate assets,

and continuing obligations to the Township of Vernon under the sewer expansion program implemented years ago by Intrawest.

17.    In late 2016, the Company retained Lowenstein Sandler to assist the Debtors in evaluating strategic alternatives.  The Company subsequently retained Getzler Heinrich LLC as its financial advisor and Houlihan Lokey to assist with valuation of its business and to advise concerning the restructuring of its balance sheet.

18.    The Company is confident that given its state of the art operations and facilities and favorable geographical proximity to millions of potential customers, the Company can use the Chapter 11 Cases in order to successfully gain access to additional capital and liquidity necessary to continue to upgrade the Resort and its facilities, restructure its balance sheet and negotiate the terms of a plan of reorganization.

19.    To familiarize the Court with the Company's businesses and the first day relief sought by the Debtors, this Declaration is organized into three sections.  **Part I** provides background information with respect to the Debtors' business operations and corporate history, as well as a summary of the Company's pre-petition capital structure.  **Part II** describes the circumstances leading to the commencement of the Chapter 11 Cases.  **Part III** summarizes the relief requested in and the facts supporting each of the First Day Pleadings.

**PART I**

**BACKGROUND**

A.    **Company Organization and Structure**

20.    Each of the Debtors (other than Appalachian Liquors Corporation ("Appalachian Liquors")) is a wholly owned subsidiary of MCRI.  MCRI owns all of the assets at the Resort other than the Mountain Coaster (defined below), the Sojourn Chairlift (defined below), and the

liquor licenses that allow for the sale of alcohol at the Resort.

21.    The Debtors' current organizational chart and a description of each entity are set forth below:



22.    Mountain Creek Services Inc. ("<u>MC Services</u>") is the payroll management company.  MC Services allocates all payroll and expenses to the applicable companies.

23.    Mountain Creek Management, LLC ("<u>MC Management</u>") runs the Hotel Operations.

24.    Mountain Creek Mountainslide, LLC ("<u>MC Mountainslide</u>") owns the Mountain Coaster roller coaster.

25.    Mountain Leasing LLC ("<u>Mountain Leasing</u>") owns the fixed-grip double chairlift that connects South Peak to Granite Peak (the "<u>Sojourn Chairlift</u>").

26.     Appalachian Liquors holds the liquor license and provides Food and Beverage Operations at the Resort and at the Appalachian Hotel. Appalachian Liquors does not hold any fixed assets. Appalachian Liquors is owned 100% by Jeffrey Koffman.

### B.     The Debtors' Prepetition Debt Structure

#### (i)     Prepetition Senior Credit Documents

27.     MCRI, as borrower, and the other Debtors (other than Appalachian Liquors), as guarantors, are parties to a loan agreement, promissory note, mortgage, security agreement and related documents dated June 4, 2015 pursuant to which M&T Bank ("M&T" or the "Prepetition Senior Lender") extended a secured financing facility to MCRI in the original principal sum of $25 million (the "M&T Loan Facility").  The M&T Loan Facility is also guaranteed by other affiliated non-debtor entities and individuals.  As of the Petition Date, approximately $22.7 million remains outstanding under the M&T Loan Facility (together with any amounts incurred or accrued, but unpaid prior to the Petition Date, the "First Lien Obligations").  To secure the First Lien Obligations, MCRI granted the Prepetition Senior Lender first-priority security interests in and liens on all of its personal and real property (collectively, the "Prepetition Collateral"), subject only to certain permitted encumbrances (the "Permitted Liens").

28.     On September 20, 2010, M&T issued an irrevocable standby letter of credit in favor of the Township of Vernon in the approximate amount of $1.97 million (the "Letter of Credit") in connection with the October 24, 2005 sewer agreement (the "Sewer Agreement") between MCRI and the Township of Vernon.  Pursuant to the reimbursement agreement between MCRI and M&T, MCRI granted security interests in the Prepetition Collateral to secure any amounts drawn on the Letter of Credit.  Together, the Letter of Credit Obligations and the First Lien Obligations will be referred to herein as the "M&T Prepetition Senior Obligations."

(ii)    <u>Prepetition Subordinated Credit Documents</u>

29.    MCRI, as borrower, is a party to a promissory note, mortgage, and security agreement dated June 4, 2015, pursuant to which HSK-MC, LLC ("<u>HSK-MC</u>") extended a secured financing facility to MCRI in the original sum of $3 million (the "<u>$3 Million Loan</u>").  To secure the $3 Million Loan, the Debtors granted to HSK-MC a mortgage and security interests in the Prepetition Collateral junior to the Prepetition Senior Obligations.  On January 1, 2016, HSK-MC assigned its rights and interest in the $3 Million Loan to HSK Industries, Inc. ("<u>HSK Industries</u>").  Also on January 1, 2016, HSK Industries, in turn, assigned its rights and interest in the $3 Million Loan to HSK Adventure, Inc. ("<u>HSK Adventure</u>").   On February 17, 2016, MCRI and HSK Adventure entered into the Amended and Restated Senior Secured Convertible Note dated June 4, 2015, in the amount of $3 million (the "<u>HSK Adventure Facility</u>").  The HSK Adventure Facility is secured by liens and security interests on the Prepetition Collateral.  As of the Petition Date, approximately $3 million was outstanding under the HSK Adventure Facility (the "<u>HSK Adventure Obligations</u>").

30.    MCRI, as borrower, is also party to a promissory note (the "<u>Senior Secured Convertible Note</u>"), mortgage, and security agreement dated February 17, 2016 pursuant to which Kuzari Investor 27335 LLC ("<u>Kuzari</u>") extended a secured financing facility to MCRI in the original sum of $2 million (the "<u>Kuzari Facility</u>").  To secure the Kuzari Facility, MCRI granted to Kuzari a mortgage and security interests in the Prepetition Collateral junior to the Prepetition Senior Obligations and the HSK Adventure obligations.   Kuzari has the option to convert the Kuzari obligations to equity of MC-KK Holdings Inc. ("<u>MC-KK Holdings</u>") pursuant to the terms of the Senior Secured Convertible Note.  The remaining Debtors (other than Appalachian Liquors) and certain other affiliated entities and individuals are guarantors of

the Kuzari Facility.  As of the Petition Date, approximately $2 million was outstanding under the

Kuzari Facility (the "<u>Kuzari Obligations</u>").

31.    MCRI, as borrower, is also a party to the Amended and Restated Promissory Note

dated May 10, 2016, pursuant to which HSK Adventure extended a secured financing facility to

MCRI in the original sum of $4 million (the "<u>HSK Adventure Junior Facility</u>").  To secure the

HSK Junior Facility, MCRI granted to HSK Adventure a mortgage and security interests in the

Prepetition Collateral junior to the Prepetition Secured Obligations, the HSK Adventure

Obligations and the Kuzari Obligations.  As of the Petition Date, approximately $4 million was

outstanding under the HSK Adventure Junior Lien Facility (the "<u>HSK Adventure Junior</u>

<u>Obligations</u>," and together with the HSK Adventure Obligations and the Kuzari Obligations, the

"<u>Prepetition Subordinated Obligations</u>").

32.    HSK Adventure is a non-debtor affiliate of the Company.  Together, HSK

Adventure and Kuzari will be referred to herein as the "<u>Prepetition Subordinated Lenders</u>."

(iii)    <u>Other Secured Financing</u>

33.    <u>Sojourn Chairlift</u>.  In 2013, Mountain Leasing acquired the Sojourn Chairlift to

connect South Peak and Granite Peak.  The purchase of the $1.6 million Sojourn Chairlift was

financed with a $1,284,800 loan (the "<u>Sojourn Loan</u>") from Visions Federal Credit Union

("<u>Visions</u>").  The Sojourn Loan is evidenced by two promissory notes dated February 13, 2013

in the original principal sums of $1,184,800 and $100,000.  The Sojourn Loan is secured by a

security interest in the Sojourn Chairlift.  As of the Petition Date, the balance due on the Sojourn

Loan was $585,839.

34.    <u>Mountain Coaster Rollercoaster</u>.    In 2015, MC Mountainslide acquired the

Mountain Coaster. The purchase of the $3.38 million Mountain Coaster was financed with a

$636,250 term loan (the "<u>Mountain Coaster Loan</u>") from Bank of America, N.A ("<u>BofA</u>").  The

Mountain Coaster Loan is evidenced by a loan agreement dated June 25, 2015 in the original principal sum of $636,250. The Mountain Coaster Loan is secured by a security interest in all personal property of MC Mountainslide including equipment, inventory, and receivables. As of the Petition Date, the balance due on the Mountain Coaster Loan was $301,388.

35.    <u>Zero G</u>. In 2015, MCRI acquired the Zero G waterslide. The purchase of the Zero G was financed with loan dated August 15, 2014, in the amount of $808,794 (the "<u>Zero G Loan</u>") from Proficio Bank. The Zero G Loan is secured by a security interest in the Zero G waterslide. As of the Petition Date, the balance due on the Zero G Loan was $300,878.

36.    <u>Rental and Demo Ski Equipment</u>. MCRI acquired rental and demo ski equipment from Head USA, Inc. ("<u>Head</u>") in 2014 and from Alpina Sports Corp. ("<u>Alpina</u>") in 2016. Invoices for this equipment were payable over two years. Sums due to Alpina on outstanding invoices are secured by purchase money security interests in the equipment purchased from Alpina. Sums due to Head on outstanding invoices are secured by purchase money security interests in the equipment purchased from Head. As of the Petition Date, the balance due on the Alpina Loan was $86,000, and the balance due on the Head Loan was $110,000.

37.    <u>Vehicles, Machinery and Equipment</u>. The Debtors are also parties to various other secured purchase money financing agreements with respect to vehicles, machinery and equipment with Axess North America ("<u>Axess</u>"), Dell Financial Services LLC ("<u>Dell</u>"), Marlin Business Bank ("<u>Marlin</u>"), Ally Financial Inc. ("<u>Ally</u>"), Kubota Credit Corporation USA ("<u>Kubota</u>"), GE Capital Information Technology Solutions ("<u>GE Capital</u>"), and Bank of the West ("<u>BOTW</u>").

38.    <u>Atlantic Health Building</u>. MCRI owns real estate and a building located at 123 Route 94, Vernon, New Jersey (the "<u>Atlantic Health Building</u>"). Atlantic Healthcare operated an

urgent care facility at the Atlantic Health Building through AHS Hospital Corporation.  Atlantic

Healthcare has vacated the building, but continues to pay rent pursuant to a lease that has not yet

terminated. Highlands State Bank ("Highlands") holds a first-priority mortgage on the property

to secure a mortgage loan in the original principal sum of $1.3 million granted on January 10,

2016 (the "Highlands Mortgage").  Another tenant, Women's Healthcare, still occupies and pays

rent for the Atlantic Health Building.  As of the Petition Date, the outstanding balance on the

Highlands Mortgage was $1,186,708.

39.    Together, Visions, BofA, Proficio Bank, Head, Alpina, Axess, Dell, Marlin, Ally,

Kubota, GE Capital, BOTW, and Highlands will be referred to herein as the "Other Secured

Lenders," and the obligations owing to them, the "Other Secured Lenders."

(iv)    Sewer Obligations

40.    MCRI is indebted to the Township of Vernon in connection with the Sewer

Agreement pursuant to which MCRI agreed to reimburse the Township for certain costs

associated with the expansion of sewer capacity for the Township and the Resort by the Sussex

County Municipal Utilities Authority ("SCUMA") and reimbursing the Township for payments

due from the Township to SCUMA on certain bonds issued by SCUMA in connection with the

sewer project.  As of the Petition Date, the Debtors estimate that the amount due to the Township

of Vernon under the sewer agreements is approximately $27 million (the "Vernon Township

Obligations").  As noted above, MCRI posted the Letter of Credit in the approximate sum of

$1.97 million to partially secure this obligation.

(v)    Unsecured Notes

41.    As of the Petition Date, MCRI is indebted to HSK-MC in the sum of $1.13

million on account of unsecured loans evidenced by two promissory notes dated June 4, 2015

(the "HSK-MC Unsecured Notes").  MCRI is also indebted to HSK Funding, Inc. in the sum of

$2.5 million on account of unsecured loans evidenced by two promissory notes also dated June

4, 2015 (the "HSK Funding Unsecured Notes").  MCRI, as borrower, is also a party to an

unsecured promissory note dated June 9, 2016, pursuant to which HSK Adventure extended a $7

million revolving line of credit (the "HSK Adventure Unsecured Note," and together with the

HSK-MC Unsecured Notes and the HSK Funding Unsecured Notes, the "HSK Unsecured

Obligations").  As of the Petition Date, the balance due under the HSK Adventure Unsecured

Note was $3.8 million.  The total debt under the HSK Unsecured Notes as of the Petition Date is

approximately $7.44 million.

42.     The Company is also indebted to prior owners of the Resort pursuant to eight (8)

unsecured notes dated June 4, 2015 in the aggregate original principal sum of $3.38 million

which are due and payable on December 31, 2022 (the "Prior Owner Notes").  As of the Petition

Date, the amount owing under the Prior Owner Notes is approximately $3.15 million (the "Prior

Owner Note Obligations").

(vi)     Trade Debt

43.     As of the Petition Date, the Debtors have aggregate unsecured debts totaling

approximately $40 million, which include amounts owing for the Vernon Township Obligations,

the HSK Unsecured Obligations, the Prior Owner Note Obligations, and for merchandise,

utilities, professional fees, insurance, and employee-related expenses.   Of that amount,

approximately $2.6 million constitutes trade vendor payables.  As discussed in detail in **Part III**

below, the Company seeks authority to pay a limited number of critical vendors who provide

crucial goods and services that cannot be re-sourced.

# PART II

## EVENTS LEADING TO THE DEBTORS' CHAPTER 11 CASES

### A.    Temporary Economic Conditions, Strategic Setbacks and Restructuring Efforts

44.    The Company filed its Chapter 11 Cases in response to a temporary decline in revenues caused by warmer than average winter seasons and planning missteps by prior ownership and management that have left the Company with large obligations that it is currently not in a position to pay.

45.    Despite the fact that the Company has expanded services and transformed itself into a four-season resort, the most lucrative aspect of the business continues to be operation of the ski resort.  Each of the last several winters have been warmer than usual with below average snowfall, resulting in the Resort having to incur additional expenses to make snow and in early closures that shortened the ski seasons.  As a result, expenses of operating the ski resort were higher and revenues were lower than projected.

46.    In addition, the Company has been negatively impacted by decisions made by prior ownership and management that have resulted in significant additional expenses.  First, prior ownership terminated a contract with Palace Entertainment pursuant to which Palace Entertainment leased and operated the waterpark.  Following termination of the contract, Palace Entertainment sued the Company for damages.  In October 2016, an independent arbitrator ruled that the termination payment due to Palace Entertainment under the contract is $5,774,952.  While the parties were still involved in litigation over the value of the Company's counter-claims as of the Petition Date, it is likely that Palace Entertainment will assert a multi-million dollar claim against the bankruptcy estates.

47.    In addition, in 2004 and 2005, Intrawest entered into a series of agreements with Vernon Township with respect to the design and construction of additional sewer capacity for Vernon Township and development of hotels, condominiums and single family homes at the Resort.  As a result of adverse economic conditions and the real estate slowdown in Vernon, aggressive development plans proposed years ago by Intrawest have not come to fruition. Nevertheless, per the agreements entered into by Intrawest, the Company is obligated to reimburse Vernon Township for certain costs associated with the project which was underwritten by bonds issued by the Sussex County Municipal Utilities Authority. As of the Petition Date, the Company estimates that it was obligated to pay Vernon Township approximately $27 million in connection with the sewer expansion project.

### B.      Need for Postpetition Financing

48.    The Debtors require, on an immediate basis, additional liquidity as a bridge to implement their restructuring initiatives.  In a motion filed concurrently herewith, and as more fully described in **Part III** below, the Debtors seek authority to enter into a $6.0 million DIP Financing (defined below) with HSK Adventure, one of their Prepetition Subordinated Lenders. The Company believes that the proposed DIP Financing presents the best financing option available under the circumstances.  The DIP Financing is fair and reasonable and will enable the Company to continue to maximize the value of the Debtors' businesses and properties, and operate their businesses through a balance sheet restructuring.

### PART III

### FIRST DAY MATTERS

### A.      Relief Sought In the First Day Pleadings[2]

---

[2] Any capitalized term used but not defined herein shall have the meaning ascribed to it in the respective First Day Pleadings.

49.     It is critically important for the Debtors to maintain the loyalty and goodwill of, among other constituencies, their vendors, employees, and customers.  Achieving this goal is likely to be particularly challenging while working to restructure their balance sheet in chapter 11.  To that end, the Debtors have filed the First Day Pleadings seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.  Unless the "first day" relief is granted, I believe the Debtors' business operations will suffer significant adverse, immediate, and irreparable consequences.

50.     Several of the First Day Pleadings request authority to pay certain pre-petition claims.  I understand that the Bankruptcy Rules do not permit the Court to consider motions to pay pre-petition claims during the first 21 days following the filing of a chapter 11 petition "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this limitation, and as set forth below, the Debtors have narrowly tailored their requests for immediate authority to pay certain pre-petition claims to only those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Accordingly, certain requests for relief will be deferred for consideration at a later hearing.

51.     I have reviewed each of the First Day Pleadings or had their contents explained to me.  The facts stated therein and described below are true and correct to the best of my knowledge, information and belief, I believe that the relief sought in each of the First Day Pleadings is critical and necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations, and constitutes a critical element in successfully

restructuring the Debtors' business.  A brief summary of the relief sought in each of the First

Day Pleadings is as follows:[3]

### B.     <u>Administrative Motions</u>

> (i)     Application for Designation as Complex Chapter 11 Cases (the "<u>Complex Chapter 11 Application</u>").

52.     By the Complex Chapter 11 Application, the Debtors request entry of an order

designating the Debtors' Chapter 11 Cases as a complex chapter 11 case pursuant to Exhibit F to

the Court's *General Order Governing Procedures for Complex Chapter 11 Cases*, and rule

6003-1 of the Local Bankruptcy Rules.

53.     I believe that the relief requested in the Complex Chapter 11 Application is in the

best interest of the Debtors' estates, their creditors, and all parties-in-interest, and will enable the

Debtors to continue to operate their businesses in a streamlined fashion and allow the U.S.

Trustee and other parties-in-interest to monitor the Chapter 11 Cases with greater ease and

efficiency.  Accordingly, on behalf of the Debtors, I respectfully submit that the Complex

Chapter 11 Application should be approved.

> (ii)    Application for Expedited Consideration of First Day Matters (the "<u>Expedited First Day Application</u>").

54.     The Debtors request entry of an order designating their First Day Pleadings as

requiring expedited consideration before this Court.  I believe that the relief requested in the

Expedited First Day Application is essential to avoid the potentially disruptive impact the

commencement of the Chapter 11 Cases might have on the Debtors and will facilitate the

Debtors' orderly transition into Chapter 11 and increase going concern value.  Accordingly, on

---

[3] This section is intended only as a summary of the key provisions of the First Day Pleadings and the relief sought therein.  To the extent that this Declaration is inconsistent with any provisions of any of the First Day Pleadings, the terms of the First Day Pleadings shall control.  The Court is respectfully referred to the First Day Pleadings for the full details thereof.

behalf of the Debtors, I respectfully submit that the Expedited First Day Application should be approved.

        (iii)   Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion").

55.     The Debtors request entry of an order pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b) directing joint administration of the Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that this Court maintain one file and one docket for each of the Chapter 11 Cases under the lead case, Mountain Creek Resorts, Inc.  Further, the Debtors request that an entry be made on the docket of each of the Chapter 11 Cases to indicate the joint administration of the Chapter 11 Cases.

56.     The Debtors also seek authority to file the monthly operating reports required by the U.S. Trustee's Operating Guidelines on a consolidated basis, but intend to track and break out disbursements on a Debtor-by-Debtor basis.

57.     Given the integrated nature of the Debtors' businesses, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party-in-interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases will almost certainly affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.

58.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

> (iv)    Debtors' Application for Entry of an Order Authorizing the Retention of  Prime Clerk as Claims and Noticing Agent Effective as of the Petition Date (the "Prime Clerk Application").

59.    Pursuant to the Prime Clerk Application, the Debtors seek to retain Prime Clerk LLC ("Prime Clerk") as claims and noticing agent in the Chapter 11 Cases.  I believe that the Debtors' estates, and particularly their creditors, will benefit from Prime Clerk's services.  Prime Clerk specializes in noticing, claims processing, and other administrative tasks necessary to operate chapter 11 cases effectively.  It is my understanding that Prime Clerk is fully equipped to manage claims issues and provide notice to creditors and other interested parties in the Chapter 11 Cases.  Therefore, on behalf of the Debtors, I respectfully submit that the Prime Clerk Application should be approved.

> (v)    Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements Motion").

60.    The Debtors request entry of an order granting a 30-day extension of the time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") for a total of 44 days after the Petition Date.  The breadth of the Debtors' business operations requires the Debtors to maintain voluminous books and records, and complex accounting systems.  Given the size and complexity of the Debtors' operations, I submit that the large amount of information that must be assembled to prepare the Schedules and Statements, and the hundreds of employee and advisor hours required to complete them, would be unnecessarily burdensome to the Debtors during the first 14 days following the Petition Date. The Debtors are sensitive to the need to complete the Schedules and Statements as soon as

possible, and they intend to complete the Schedules and Statements before the proposed 44-day

deadline, if possible.

61.     I believe that the relief requested in the Schedules and Statements Motion is in the

best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the

Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be

granted.

> (vi)   Debtors' Motion for Entry of an Order (I) Granting the Debtors an
> Extension of Time to File Their List of Creditors and (II)
> Authorizing the Debtors and/or Their Agent to (A) Prepare
> Consolidated Lists of Creditors and Interest Holders in Lieu of a
> Mailing Matrix, (B) File a Consolidated List of the Debtors'
> Twenty Largest Unsecured Creditors, and (C) Mail Initial Notices
> (the "Creditor Matrix Motion").

62.     Pursuant to the Creditor Matrix Motion, the Debtors request entry of an order

granting them an extension of time to file their list of creditors for 30 days after the Petition

Date.  The Debtors also propose to prepare a consolidated list of creditors and interest holders

available to all parties-in-interest in lieu of submitting a mailing matrix.  Additionally, the

Debtors seek authority to file a consolidated list of the Debtors' creditors holding the 20 largest

unsecured claims.  Finally, the Debtors request that Prime Clerk, their proposed notice and

claims agent, undertake all mailings directed by this Court, the U.S. Trustee, or as required by

the Bankruptcy Code, including the notice of commencement of the Chapter 11 Cases.

63.     As previously stated, the breadth of the Debtors' business operations require the

Debtors to maintain voluminous books and records, and complex accounting systems.  Given the

size and scope of the Debtors' operations, I submit that the large amount of information that

must be assembled to prepare the list of creditors, and the hundreds of employee and advisor

hours required to complete it, would be unnecessarily burdensome to the Debtors at the

beginning of the Chapter 11 Cases, which is a critical time for the Debtors.  The Debtors are sensitive to the need to complete the list of creditors as soon as possible, and they intend to complete the list of creditors before the proposed 30-day deadline, if possible.

64.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be granted.

### C.     Operational Motions

65.     The Debtors intend to ask for relief with respect to the following First Day Pleadings that directly impact the Debtors' ability to operate their businesses and manage their properties as a going concern.

> (i)     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-petition Financing on a Secured And Superpriority Basis; (II) Authorizing the Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Scheduling Final Hearing Thereon; and (V) Granting Related Relief ("DIP Financing Motion").

66.     Subject to Court approval, the Debtors have negotiated and reached an agreement to enter into a postpetition financing agreement (the "DIP Financing" or the "DIP Facility") that consists of a secured, superpriority postpetition credit facility in the aggregate amount of up to $6.0 million (the "DIP Loan").  In the ordinary course of business, the Debtors use cash on hand and cash flow from operations to fund working capital, inventory purchases, capital expenditures, and for other general corporate purposes.  An inability to use these funds during the Chapter 11 Cases could cripple the Debtors' business operations.  Indeed, the Debtors must use their cash to, among other things, continue operating their businesses in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay employees, and

satisfy other working capital and operational needs - all of which are necessary to preserve and maintain the Debtors' going concern value and, ultimately, effectuate a successful reorganization. As set forth in more detail in the DIP Financing Motion, access to the DIP Facility and use of Cash Collateral (as defined in the DIP Financing Motion) are critical to the Debtors' ability to continue to operate through these Chapter 11 Cases and to permit the Debtors' to maximize value for the benefit of their stakeholders. After pursuing other avenues for funding their continuing operations, the Debtors have determined that the DIP Facility with HSK Adventure is the best financing option available to them.  The financing provided under the DIP Facility is the aggregate amount of $6 million, with $2 million to be made available immediately upon interim approval.  The stated maturity of the financing is January 31, 2018.  The financing will be secured by a first priority lien on any unencumbered assets and a lien junior to all valid and nonavoidable prepetition liens and other than those held by HSK Adventure and Kuzari.  It is my understanding that HSK Adventure and Kuzari consent to the priming of their prepetition liens.

67.     The DIP Facility will provide the Debtors the liquidity necessary to continue to operate through a plan of reorganization.  Approval of the DIP Facility will permit the Debtors to continue to operate their business and satisfy critical financing obligations during the Chapter 11 Cases.   Given the Debtors' costly requirements and payroll obligations, the Debtors need approval of the financing no later than on on Wednesday, May 17, 2017.

68.     As set forth in the DIP Financing Motion, the Debtors' execution of the DIP Facility agreements is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of the Chapter 11 Cases.  Based on such

analysis, the Debtors determined that post-petition financing was necessary to support their operational and restructuring activities.

69.     After a series of good faith, arm's-length negotiations, the Debtors and the DIP Lender entered into the DIP Financing Credit Agreement, whereby the parties reached agreement on the material terms of the DIP Facility.   Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Credit Agreement provides a greater amount of financing on more favorable terms than any other reasonably available alternative.   Without postpetition financing, the Debtors would be unable to continue operations without interruption or pursue an orderly sale of their assets under section 363 of the Bankruptcy Code.

70.     The Debtors and their advisors have canvassed the market to find parties interested in extending debtor-in-possession financing.  The Debtors' advisors have assisted the Debtors in negotiations to obtain the best terms available to ensure that the DIP Facility was fully subscribed.  For a number of reasons, however, including but not limited to, the existence of liens granted to the Prepetition Senior Lender and the Prepetition Subordinated Lenders, none of the institutions contacted were willing or available to provide financing to the Debtors on terms acceptable to the Debtors, including the amount and in the time frame required to address the Debtors' urgent liquidity needs.

71.     Moreover, as noted, virtually all of the Debtors' assets are encumbered by prepetition liens.  Thus, even if alternative debtor-in-possession financing was available on more favorable terms and conditions, and could be consummated in a timely fashion, such financing would result in a protracted priming contest with the Prepetition Secured Creditors, the results of

which could not be predicted with certainty.  Any protracted litigation would jeopardize the Chapter 11 Cases from the outset.

72.    The Debtors' ability to finance their operations and the availability of sufficient working capital and liquidity are vital to preserve and maintain the Debtors' going-concern value and maximize the value of the Debtors' estates for the benefit of all creditors.  As discussed in detail in the DIP Financing Motion, the Debtors require immediate access to financing and Cash Collateral in order to meet their liquidity needs in connection with the Chapter 11 Cases.  While the Interim DIP Order approves the Debtors' authorization to enter into a DIP Credit Agreement, the Debtors submit that such relief is inseparable from the relief relating to the use of Cash Collateral.

73.    For the foregoing reasons, I believe that the terms and conditions of the DIP Facility and the use of Cash Collateral are fair, reasonable, and negotiated in good faith and at arms' length after reasonable efforts to obtain the most advantageous post-petition financing. The Debtors and their advisors have determined, in their reasonable business judgment, that the DIP Facility is the best financing option available under the present circumstances.  I further believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable to the Debtors to operate their businesses in chapter 11 without disruption.   On behalf of the Debtors, I respectfully submit that the Court should (a) approve immediate access to the DIP Facility and use of Cash Collateral on an interim basis pursuant to the Interim DIP Order and (b) enter the Final DIP Order at the Final Hearing (as those terms are defined in the DIP Financing Motion).

(ii)    Debtors' Motion for an Order (I) Authorizing the Debtors to Continue and Maintain Their Existing Cash Management System, Bank Accounts and Business Forms, (II) Modifying the Investment Guidelines, (III) Providing the United States Trustee With a 60-Day

Objection Period and (IV) Granting Related Relief (the "<u>Cash Management Motion</u>").

74.     The Debtors request entry of an order authorizing them to (a) continue using their existing cash management system, bank accounts and business forms, (b) modifying the investment guidelines, (c) providing the U.S. Trustee with a 60-day objection period, and (d) granting related relief.  In addition, the Debtors further request that this Court authorize and direct the Debtors' Banks to (a) continue to maintain, service, and administer the Bank Accounts (as defined in the Cash Management Motion), and (b) debit the Bank Accounts in the ordinary course of business.

75.     In the ordinary course of their business, the Debtors utilize an integrated, centralized cash management system to collect, transfer and disburse funds generated by their operations.  The Cash Management System (as defined in the Cash Management Motion) is specifically tailored to meet the Debtors' current operating needs, enabling the Debtors to centrally control and monitor corporate funds and available cash, as well as to keep accurate account balances and presentment information.

76.     If the Debtors are required to open separate accounts as debtors-in-possession and modify the Cash Management System in accordance with the U.S. Trustee Guidelines, such process would necessitate opening new accounts for collections, cash concentration, and disbursements.  In fact, the Debtors would need to open dozens of new bank accounts.  Thus, the Debtors' treasury, accounting, and bookkeeping employees would be forced to focus exclusively on immediately opening new bank accounts, instead of on their daily responsibilities during this critical juncture of the Chapter 11 Cases.  The opening of new bank accounts would certainly increase operating costs, thereby negatively impacting the Debtors' cash flow.  Most importantly, delays that would result from opening new accounts, revising cash management

procedures, instructing customers to redirect payments, and implementing new information technology protocols would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements. Additionally, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new signatory cards and depository agreements, and create an entirely new manual system for issuing checks and paying post-petition obligations.

77.     I believe the Debtors' continued use of the Cash Management System will greatly facilitate their transition into the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses, minimizing delays in payment of post-petition debts, and providing important internal controls. I believe that parties-in-interest will not be harmed by the Debtors' maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date. Specifically, the Debtors and their advisors have implemented internal protocols that prohibit payments on account of pre-petition debts without the prior approval of appropriate managers. In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

78.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will enable the Debtors to operate their businesses in chapter 11 without disruption. Therefore, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.

       (iii)    Debtors' Motion for an Order (I) Authorizing, but not Directing, the Debtors to Pay Pre-Petition Wages, Salaries and Related Obligations and Taxes, and (II) Directing all Banks to Honor

Checks and Transfers for Payment of Pre-Petition Employee Obligations (the "Wages Motion").

79.     By the Wages Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to (i) pay all amounts owed on account of Prepetition Wages (defined below), (ii) pay and remit to the appropriate third parties and taxing authorities all Deductions and Payroll Taxes for which Employee payroll deductions were withheld prepetition, (iii) continue Employee practices and policies with respect to PTO, (iv) continue to honor, make contributions to, and pay the Health and Welfare Benefits (defined below), (v) honor and continue their Workers' Compensation Insurance, (vi) continue to honor, make contributions to the 401k Plan, and (vii) pay any miscellaneous prepetition costs and expenses incidental to payment of the foregoing including, but not limited to, all administrative and processing costs and expenses (collectively, the "Employee Obligations").

80.     In the ordinary course of business, the number of individuals the Debtors employ varies depending on the season.  During the Resort's peak winter season, the Debtors employ approximately 1250 individuals.  During the summer season, the Debtors employ approximately 870 individuals.  In the fall, the Debtors employ approximately 340 individuals, and during the spring season, the Debtors employ approximately 260 individuals. Over the course of the year, the Debtors employ approximately 1700 employees in the aggregate.

81.     The Debtors seek authority to pay accrued prepetition Employee Obligations in the ordinary course of business in the following approximate amounts:

| Category | Accrued Prepetition Amount |
|---|---|
| Wages | $328,318.46[4] |
| Deductions | $5,418.61 |

---

[4] The Debtors do not believe that any Employee is owed more than the $12,850 priority claim amount established pursuant to sections 507(a)(4) and (5) of the Bankruptcy Code.

| Category | Accrued Prepetition Amount |
|---|---|
| Payroll Taxes /Withholdings | $101,637.48 |
| Health and Welfare Benefits | $7,384.18 |
| 401(k) Plan Match | $4,754.56 |

82.     In the ordinary course of their business, the Debtors make available various Employee health, welfare and benefits programs including, but not limited to, the following (collectively, the "Health and Welfare Benefits").

83.     The Debtors' medical health insurance plans are self-insured and administered on behalf of the Debtors by Blue Cross & Blue Shield, ("BCBS"). The Debtors' Employee dental and vision insurance plans are provided through Principal and funded in part by the Debtors and in part by Employee contributions via payroll deductions. The Debtors request authority to continue to honor these arrangements post-petition.

84.     The continued, uninterrupted service of the Employees is essential to the Debtors' reorganization efforts.   I believe that the success of the Debtors' restructuring efforts is dependent upon the continued dedication, goodwill, and support of their Employees.  I further believe that any delay in paying the Employee Obligations outstanding as of the Petition Date, a failure by the Debtors to continue their practices, programs, and policies with respect to Employee benefits, could severely disrupt the Debtors' relationship with their workforce, impair morale at this critical juncture, and disrupt the Debtors' business operations.  Absent payment of all accrued Employee Obligations and continuation of the Debtors' benefits programs, I believe that Employees may quickly seek alternative employment, (which would hinder the Debtors' ability to serve their customers while simultaneously requiring the Debtors to incur the cost and distraction of seeking replacement Employees instead of focusing on their reorganization efforts. I believe that the relief requested in the Wages Motion is in the best interests of the Debtors, their

estates and creditors, and all other parties-in-interest in the Chapter 11 Cases, and will enable the

Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted.

Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be

granted.

> (iv)   Debtors' Motion for an Order Authorizing, but not Directing, the Debtors to Pay Certain Pre-Petition Sales, Use, Income, Property and Other Miscellaneous Taxes and Fees, and Granting Related Relief (the "<u>Tax Motion</u>").

85.     In the Tax Motion, the Debtors request entry of an order authorizing them to pay

taxes and governmental fees (including, but not limited to, sales, use, hotel occupancy, real

property, tobacco, CBT and income taxes, as well as liquor license fees) that accrued or arose in

the ordinary course of business before the Petition Date.  The Debtors estimate that the following

approximate amounts of taxes and fees in each category, totaling approximately $43,050 in the

aggregate, have accrued and remain owing as of the Petition Date:

| Category | Approximate Amount |
|---|---|
| Sales & Use Taxes | $32,300 |
| Occupancy Taxes & Fees | $10,750 |

86.     The Debtors must continue to pay all taxes and governmental fees when due to

continue operating in certain jurisdictions.  Failure to pay all taxes and governmental fees

(including taxes and fees that arose pre-petition) when due could result in taxing authorities

suspending the Debtors' ability to operate, filing liens, and/or seeking relief from the automatic

stay to take action against the Debtors.  In many jurisdictions, certain taxes, such as sales taxes,

are collected in trust for the applicable taxing authorities.  Moreover, many jurisdictions may

seek to impose liability on the Debtors' directors and officers for unpaid taxes, distracting the

Debtors' key management personnel from the Debtors' reorganization efforts at a time when their commitment to the Debtors is most critical.

87.     The relief the Debtors seek in the Tax Motion will enable the Debtors to continue to operate their business during the Chapter 11 Cases uninterrupted.  Accordingly, to prevent immediate, irreparable harm to the Debtors' business, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors and their estates and creditors and all other parties-in-interest in the Chapter 11 Cases and, therefore, should be granted.

> (v)    Debtors' Motion for an Order (I) Authorizing, but not Directing, the Debtors to Honor Certain Pre-Petition Obligations to Customers and Continue, Renew, Replace, Modify, Implement or Terminate Customer Programs In the Ordinary Course of Business, and (II) Authorizing and Directing Financial Institutions to Honor All Related Checks And Electronic Payment Requests (the "Customer Programs Motion").

88.     In the ordinary course of their business, the Debtors engage in certain marketing and sales practices that are, among other things, (i) targeted to develop and sustain positive reputations for the Resort and (ii) designed to attract new customers to the Resort and to enhance loyalty and sales among the Debtors' existing customer base.

89.     By the Customer Programs Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to honor certain pre-petition obligations to customers, and continue, renew, replace, modify, implement new, and/or terminate their Customer Programs (defined below) in the ordinary course of business without further application to the Court, and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

**(a)    Gift Cards**

90.     The Debtors issue gift cards in a variety of denominations (collectively, the "Gift Cards"), which are redeemable for admission, rentals, lessons, and retail purchases (with certain

restrictions).   As of the Petition Date, the aggregate amount of Gift Cards outstanding is

approximately $85,234.  The outstanding Gift Cards constitute potential non-cash obligations of

the Debtors.

**(b)   Season Passes**

91.     The Debtors' sell various season passes for the ski resort, the bike park, and the

waterpark, including the "All Access Season Pass," the "Mid-Week Plus Season Pass," the "Max

Pass," the "Seniors Season Pass," and the "Lifetime Season Pass," (collectively, the "Season

Pass(es)"). Holders of Season Passes are also entitled to exclusive discounts and offers.  As of

the Petition Date, the aggregate amount of season passes outstanding is approximately $577,517.

**(c)   Triple Play Cards**

92.     The Debtors also sell "Triple Play Cards" for the ski resort and the bike park.

Triple Play Cards enable customers to visit the ski resort or bike park three times at a discounted

rate.   As of the Petition Date, the aggregate amount of Triple Play Cards outstanding is

approximately $19,630.

**(d)   Resort Credits**

93.     With respect to Season Passes and Triple Play Cards, the Debtors have a "No

Refund" policy.  However, in the event a Season Pass holder experiences a debilitating injury or

illness that prevents participation in the sport of skiing/riding, or a relocation or transfer due to

employment more than 100 miles from the resort, the Debtors may, at their discretion, either

approve a credit towards a Season Pass for the next winter season, or allow for a monetary

refund by gift card ("Resort Credits").  Resort Credits are also issued from time to time for event

cancellations.  As of the Petition Date, the aggregate amount of Resort Credits outstanding is

approximately $795,493.  The unredeemed Resort Credits constitute non-cash obligations of the Debtors.

### (e)    Deposits

94.    As set forth in more detail in the First Day Declaration, the Debtors operate a wedding venue and banquet hall at the Red Tail Lodge.  In the ordinary course of business, the Debtors' clients deposit money to reserve future goods and services in connection with Red Tail Lodge events including but not limited to weddings, anniversary parties, corporate conferences, and other catered events (the "Banquet Events").  In connection with the Banquet Events, the Debtors currently hold various Deposits in amounts ranging from $750 to $100,000 (the "Banquet Deposits").  As of the Petition Date, the aggregate amount of Banquet Deposits held by the Debtors in connection with future Banquet Events is approximately $737,200.

95.    Additionally, the Debtors collect group sales deposits from various organizations including summer camps, sports clubs, and other similar groups to reserve recreational group trips and events at the Resort (the "Group Sales Deposits").   As of the Petition Date, the aggregate amount of deposits held by the Debtors in connection with Resort Events is approximately $69,000.

96.    The Debtors also collect deposits from guests to reserve lodging and accommodations at the Appalachian Hotel (the "Hotel Deposits," and together with the Banquet Deposits and the Group Sales Deposits, the "Deposits").  As of the Petition Date, the aggregate amount of Hotel Deposits held by the Debtors is approximately $87,000.

### (f)    Condominium Rental Pool

97.    The Debtors operate the Appalachian Hotel and the Black Creek Sanctuary townhomes, which are structured as residential condominiums sold to individuals.  Individual

unit owners have the option of placing their unit within a hotel rental pool operated by the Resort (the "Rental Pool"), in which units are offered as part of the full-service hotel. The unit owners then receive payment from the Debtors for their participation in the Rental Pool. As of the Petition Date, the Debtors believe they are current on all Rental Pool payments.

### (g)    Other Customer Programs

98.    In the ordinary course of business, in addition to the Gift Cards, Season Passes, Triple Play Cards, Resort Credits, Rental Pool, and Deposits the Debtors engage in various other customer programs including discounts and offers to their employees, the public, and the guests of a local operator of golf resorts—the Crystal Springs Resort (collectively, the "Customer Programs"). Although the Debtors do not believe they have any outstanding pre-petition obligations in connection with these Customer Programs, the Debtors, out of an abundance of caution, request authority to continue to honor any obligations related to these programs post-petition in the ordinary course of business, regardless of when they may be deemed to arise.

99.    I believe that the continuance of the Customer Programs in the ordinary course of business and the authority to satisfy pre-petition obligations relating thereto are essential to facilitate the Debtors' transition into chapter 11, maintain customer confidence and trust, and enable the Debtors' to successfully undergo the chapter 11 reorganization process. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be granted.

> (vi)    Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service on Account of Pre-Petition Invoices, (II) Approving the Debtors' Proposed Form of Adequate Assurance of Future Payment, (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance and (IV) Scheduling a Final Hearing (the "Utilities Motion").

100.    Prior to the Petition Date, in the ordinary course of the Debtors' business, the Debtors spent approximately $2,307,957.96 annually to provide various Utility Services for the Resort, with an average monthly cost of approximately $192,329.83.

101.    By this motion, the Debtors request entry of an order (a) determining that their utility providers (the "Utility Companies") have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed offer of adequate assurance (including an adequate assurance deposit of $88,767.62 (the "Adequate Assurance Deposit")) and procedures whereby Utility Companies may request additional or different adequate assurance (the "Adequate Assurance Procedures"), (c) prohibiting the Utility Companies from altering, refusing or discontinuing services on account of pre-petition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance, (d) establishing procedures for the Utility Companies to object to the Debtors' proposed adequate assurance procedures, and (e) determining that the Debtors are not required to provide any additional adequate assurance.

102.    I believe that uninterrupted Utility Services for the Resort is essential to the Debtors' ongoing operations.  Additionally, any interruption of Utility Services, even for a brief period of time, likely would negatively affect the Debtors' restructuring efforts.  I believe, and I am, advised that the proposed Adequate Assurance Procedures and the proposed Adequate Assurance Deposit of $88,767.62 are necessary in the Chapter 11 Cases because if such measures are not approved, the Debtors could be forced to address numerous requests by the Utility Companies for adequate security in a disorganized manner during the critical first weeks of the Chapter 11 Cases.  Moreover, absent the relief sought in the Utilities Motions, a Utility Provider could severely disrupt the Debtors' operations by unilaterally deciding that it is not

adequately protected and threaten to discontinue service or make an exorbitant demand for payment to continue service. Discontinuation of utility service could essentially shut down business; any significant disruption of operations could put the Chapter 11 Cases in jeopardy.

103.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

> (vii)    Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, the Debtors to Pay Certain Pre-Petition Claims of Certain Critical Vendors (the "Critical Vendor Motion").

104.    The Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records and consulting operations management and purchasing personnel to identify certain critical business relationships and/or suppliers of goods and services (the "Critical Vendors"),[5] the loss of which could immediately and irreparably harm their businesses, shrink their market share, reduce their enterprise value, and/or significantly impair their going-concern viability.

105.    The Critical Vendors constitute a small portion of the Debtors' trade vendors by both number and dollar amount owed. Specifically, the Critical Vendors total approximately fifteen (15) vendors and the prepetition trade amount owed to Critical Vendors (the "Critical Vendor Claims") represents approximately 20% of the Debtors' total prepetition trade obligations of approximately $2.6 million. Moreover, the Debtors estimate that, as of the Petition Date, they owe Critical Vendors approximately $56,600 in the aggregate for goods received by the Debtors within 20 days of the Petition Date (approximately 11% of the

---

[5] The Debtor will provide the list of Critical Vendors to the DIP Lender and counsel to the Official Committee of Unsecured Creditors (if any) appointed in these cases upon agreement from such parties that such information will be treated as confidential.

prepetition Critical Vendor claims), which amounts may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

106.    The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying goods and services to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the twelve (12) months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and each Critical Vendor.  The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

107.    I believe that the authority to pay Critical Vendors and the continued availability of trade credit as requested in the Critical Vendor Motion will enable the Debtors to maximize the value of their businesses, and avoid the termination of business by the Critical Vendors and the resulting need for increased funding that would ultimately impede the Debtors' ability to operate.  The authority to pay the Critical Vendor Claims on the terms set forth in the Critical Vendor Motion is therefore in the best interests of the Debtors, their estates, customers, and creditors.  Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Critical Vendor Motion be granted.

> (viii)  Debtors' Motion For Interim And Final Orders Authorizing (I) The Continuation Of The Debtors' Insurance Policies (II) The Continuation Of The Debtors' Premium Financing Agreements And (III) The Performance Of All Prepetition Obligations Related Thereto ("Insurance Motion").

108.    In connection with the day-to-day operations of their business, the Debtors maintain various business insurance policies (the "Insurance Policies," and each, an "Insurance Policy") through several different insurance providers (the "Insurance Providers").  The Debtors

have numerous Insurance Policies covering a variety of matters such as general liability, auto liability, cyber liability, property liability, directors' and officers' liability, fiduciary liability, and crime liability.[6] The Insurance Policies that are the subjects of the Insurance Motion include those that are listed in the schedule attached to the Insurance Motion as <u>Exhibit A</u> (the "<u>Insurance Schedule</u>").

109.    The Debtors finance the premiums owed under all but one of their Insurance Policies. The Debtors finance the premiums for the majority of their existing Insurance Policies (the "<u>Financed Policies</u>") because it is not economically advantageous for the Debtors to pay those premiums in full on a lump-sum basis. The Financed Policies are financed pursuant various Commercial Premium Finance Agreements (the "<u>Financing Agreements</u>," and each, a "<u>Financing Agreement</u>") with First Insurance Funding ("<u>First Insurance</u>").

110.    The Financing Agreements provide the Debtors with general liability, cyber liability, property liability, directors' and officers' liability, fiduciary liability, and crime liability insurance through nine Insurance Policies with Beazley Insurance Co., Axis Surplus Insurance Co., Scottsdale Insurance Co., Landmark American Insurance Co., Genesis Insurance Co., Great American Assurance Co., and National Union Fire Insurance Co. of Pittsburgh PA, as indicated on the Insurance Schedule.

111.    Accordingly, on behalf of the Debtors, I respectfully request that the relief requested in the Insurance Motion be granted to prevent any disruption of the Debtors' Insurance Policies and Financing Agreements and any attendant harm to the Debtors' businesses that such disruption would cause.

---

[6] The Debtors also maintain certain insurance policies and programs as part of the health and welfare benefits offered by the Debtors to their employees.  Such insurance policies and programs are the subject of the Wages Motion filed by the Debtors in connection with the commencement of the Chapter 11 Cases.

**D.**    <u>**Conclusion**</u>

112.    The relief sought in each of the First Day Pleadings will minimize the adverse effects of the Chapter 11 Cases on the Debtors and result in maximum creditor recoveries.  I believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate effectively as debtors-in-possession.

113.    Accordingly, for the reasons stated herein and in each of the First Day Pleadings, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as this Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

I certify under penalty of perjury that, to the best of my knowledge, information and

belief, the statements set forth in this Declaration are true and correct.


Dated:   May 12, 2017                    By:/s/ *Jeffrey Koffman*
                                            Jeffrey Koffman